# 24-646

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖❖

OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,
STATE TEACHERS RETIREMENT SYSTEM OF OHIO,

*Plaintiff-Appellants,*

COLLINSVILLE POLICE PENSION BOARD ON BEHALF OF THE COLLINSVILLE
POLICE PENSION FUND, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, TOME TODOROVSKI, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED, VIOLETA TODOROVSKI, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs,*

—against—

DISCOVERY, INC., WARNER BROS. DISCOVERY, INC., DAVID ZASLAV, GUNNAR
WIEDENFELS, ADVANCE/NEWHOUSE PARTNERSHIP, ADVANCE/NEWHOUSE
PROGRAMMING PARTNERSHIP, STEVEN A. MIRON, ROBERT J. MIRON, STEVEN
O. NEWHOUSE,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

JONATHAN BERRY
  *Counsel of Record*
R. TRENT MCCOTTER
BOYDEN GRAY PLLC
801 17th Street, NW, Suite 350
Washington, D.C. 20006
(202) 955-0620
jberry@boydengray.com

DANIEL L. BERGER
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

*Counsel for Plaintiffs-Appellants Ohio Public Employees
Retirement System, State Teachers Retirement System of Ohio*

(*Counsel continued on inside cover*)

Dave Yost
Ohio Attorney General
30 East Broad Street
Columbus, Ohio 43215
(614) 466-4986

*Additional Counsel for Plaintiffs-*
*Appellants Ohio Public*
*Employees Retirement System*
*and State Teachers Retirement*
*System of Ohio*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio hereby certifies that it has no parent entities and does not issue stock.

Dated: May 13, 2024                    /s/ Jonathan Berry

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... vii

JURISDICTIONAL STATEMENT............................................ 1

STATEMENT OF THE ISSUES ............................................. 1

INTRODUCTION ................................................................... 2

STATEMENT OF THE CASE ................................................ 5

    A.    The "Streaming Wars" Pit Traditional Content Producers Like Warner Brothers Against Insurgent Content Distributors Like Netflix.................................. 5

    B.    WarnerMedia Historically Succeeded As a Content Producer Licensing Content to Third-Party Distributors.................................................................... 9

    C.    At the Onset of the "Streaming Wars," WarnerMedia Previously Attempted to Compete with Leading Distributors but Failed................................................ 12

    D.    Pre-Merger, Discovery Was a Middle-Market Television Network Company with Little Distribution Prowess. ................................................................... 16

    E.    Discovery Successfully Persuaded AT&T to Offload WarnerMedia via the Merger..................................... 17

    F.    Discovery Convinced Investors That Its Acquisition of WarnerMedia Would Position WBD to Compete with Leading Distributors. .......................................... 19

    G.    The Market Reacted Negatively When WBD's Poor Competitive Footing Was Revealed. ........................... 24

    H.    The District Court Proceedings Below........................ 30

SUMMARY OF THE ARGUMENT....................................... 30

iv

STANDARD OF REVIEW ..................................................... 38

ARGUMENT ....................................................................... 39

    I.    THE COMPLAINT IS SUBJECT TO RULE 8(a)
           AND THE MINIMAL BURDENS OF PLEADING
           VIOLATIONS OF SECTION 11 AND SECTION 12
           OF THE SECURITIES ACT .................................................. 39

    II.   WBD MATERIALLY MISLED INVESTORS BY
           MISREPRESENTING THE NUMBER OF ITS
           SUBSCRIBERS. .................................................................. 42

           A.   The Number of Non-Paying and Non-Core WBD
                Subscribers Was Material. .......................................... 42

           B.   The District Court Erroneously Failed to Accept
                the Complaint's Facts and Draw Reasonable
                Inferences in Favor of the Plaintiffs. ......................... 46

    III.  WBD MATERIALLY MISLED INVESTORS BY
           OMITTING THAT WARNERMEDIA HAD ALREADY
           HALTED ITS LUCRATIVE THIRD-PARTY
           LICENSING PRACTICE ..................................................... 52

           A.   The Offering Documents' Omission of
                WarnerMedia's Shift Away from Third-Party
                Licensing Was Materially Misleading. ....................... 53

           B.   The District Court Again Erroneously Failed to
                 Accept the Complaint's Facts and Draw Reasonable
                Inferences in Favor of the Plaintiffs. ......................... 55

    IV.  WBD MATERIALLY MISLED INVESTORS BY
            OMITTING THAT WARNERMEDIA WAS ALREADY
           FORGOING REVENUES FROM EXCLUSIVE
           THEATRICAL RELEASES. ................................................ 61

A. The Offering Documents' Omission of WarnerMedia's Direct-to-Streaming Strategy Was Materially Misleading. ........................................ 61

B. The District Court Erroneously Drew an Unreasonable Inference Against Plaintiffs. ................. 63

V. THE OMITTED FACTS WERE KNOWABLE AND AVAILABLE TO DEFENDANTS. ....................................... 65

VI. PLAINTIFFS ADEQUATELY ALLEGED CONTROL PERSON LIABILITY PURSUANT TO SECTION 15. ........ 66

CONCLUSION ........................................................................ 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) .................................................. 52

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 41

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................................. 43

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012)............................................................. 51

*ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)......................................................... 45

*In re Eros Int'l Secs. Litig.*,
    No. 1:15-cv-8956, 2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017) ...................................................................................................... 51

*Friedman v. Endo Int'l PLC*,
    No. 1:16-cv-3912, 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ........... 55

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) .................................................. 40

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................. 57

*In re Globalstar Sec. Litig.*,
    No. 1:01-cv-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ...................................................................................................... 45

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ....................................................................... 4, 39

*HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021) .................................................. 65

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................. 50

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2021) .................................................................. 39

*Koppel v. 4987 Corp.*,
  167 F.3d 125 (2d Cir. 1999) .................................................................. 60

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  No. 1:11-cv-2700, 2012 WL 3957916 (S.D.N.Y. Sept. 10,
  2012) ...................................................................................................... 40

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ........................................ 40, 41, 43, 45, 57

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ........................................................... 54, 61

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 20, 2022) ................. 60

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014) ................................................... 65

*Seibert v. Sperry Rand Corp.*,
  586 F.2d 949 (2d Cir. 1978) ................................................................ 59

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020) ................................................................ 42

*Solomon v. Sprint Corp.*,
  No. 1:19-cv-5272, 2022 WL 889897 (S.D.N.Y. March 25,
  2022) ...................................................................................................... 54

*Swierkiewicz v. Sorema NA*,
  534 U.S. 506 (2002) .............................................................................. 41

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
   985 F.2d 1190 (2d Cir. 1993) .......................................................58, 59

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ................................................................... 7

*In re WorldSpace Sec. Litig.*,
   No. 1:07-cv-2252, 2008 WL 2856519 (S.D.N.Y. July 21,
   2008) ..................................................................................... 44

## Statutes & Regulations

15 U.S.C. § 77k(a) ....................................................................... 39

15 U.S.C. § 77*l*(a)(2) ................................................................... 39

15 U.S.C. § 77v ........................................................................... 1

15 U.S.C. § 77z-1 ......................................................................... 51

15 U.S.C. § 78u-4(b)(1)(B) ............................................................. 51

17 C.F.R. § 230.425 ...................................................................... 22

28 U.S.C. § 1291 .......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

17 C.F.R. § 230.425 ...................................................................... 22

## Other Authorities

Adam Davidson, *How Does the Film Industry Actually Make
   Money?*, N.Y. TIMES MAG. (June 26, 2012) ........................................... 6

Amol Sharma, *Amazon Mines Its Data Trove to Bet on TV's
   Next Hit*, WALL ST. J. (Nov. 2, 2013) ................................................. 8

Brooks Barnes, *The Streaming Era Has Finally Arrived.
   Everything Is About to Change*, N.Y. TIMES (Nov. 18, 2019) ......... 5, 13

ix

Claudia Eller & Cynthia Littleton, *How David Zaslav Plans to Combine Discovery and WarnerMedia to Unleash 'Shock and Awe' on the Streaming Wars*, VARIETY (Dec. 8, 2021) ............... 21

FELIX GILLETTE & JOHN KOBLIN, IT'S NOT TV: THE SPECTACULAR RISE, REVOLUTION, AND FUTURE OF HBO (2022) ...............................................................8, 9, 11, 13

GERALD MAST, THE MOVIES: A SHORT HISTORY (5th ed. 1996) ................ 7

HAROLD L. VOGEL, ENTERTAINMENT INDUSTRY ECONOMICS: A GUIDE FOR FINANCIAL ANALYSIS (4th ed. 1998) ................................... 7

Richard E. Caves, *Contracts Between Art and Commerce*, 17 J. ECON. PERSPS., Spring 2003, at 73 ...................................................... 6

S. Abraham Ravid et al., *The Economics of Filmed Entertainment in the Digital Era*, 45 J. CULTURAL ECON. 157 (2021) ...................................................................................... 8

Travis Kavulla, *The Economics—and Politics—of Broadband*, 2 AM. AFFAIRS, Winter 2018, at 87 ................................................12, 13

*Warner Bros.: 100 Years, 100 Essential Movies*, ROTTEN TOMATOES ...................................................................................... 10

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v. The district court entered final judgment, dismissing Plaintiffs' Amended Class Action Complaint (the "Complaint"). SPA1–30.[1] Plaintiff filed a timely notice of Appeal on March 4, 2024. JA1061–63. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.   Whether the district court erroneously applied a more stringent pleading standard than permitted by Rule 8(a) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.   Whether Warner Brothers Discovery, Inc. ("WBD")'s securities offering documents were materially misleading because they failed to disclose that 10 million of WBD's reported subscribers were non-

---

[1] Citations herein to the Joint Appendix and the Special Appendix are referred to as "JA" and "SPA," respectively. All emphasis is added, and citations and quotation marks omitted unless otherwise noted.

paying or were subscribers to non-core WBD streaming products, resulting in an 11 percent overstatement of WBD's total subscribers.

3. Whether WBD's securities offering documents were materially misleading because they stated that WarnerMedia, the entertainment content producer acquired in the merger that created WBD, continued to generate revenues primarily from licensing its content to third parties but omitted that WarnerMedia had already suffered significant revenue reductions from its attempts to make its content exclusively available on its streaming services.

## INTRODUCTION

The media and television company Discovery, Inc. ("Discovery") sold investors on its $40 billion acquisition of the iconic WarnerMedia business (the "Merger") by asserting that the combined entity was positioned to compete with the streaming-platform giants that dominate the entertainment market today. That was misleading. WarnerMedia—the corporate parent of the historically successful entertainment content producers Warner Brothers and HBO—was already attempting to compete with leading streaming platforms like Netflix, but was failing, forgoing significant revenue in the process.

Instead of acknowledging these challenges, Discovery portrayed the acquisition as creating a winner.

In its securities registration filings for the merger, Discovery billed the newly merged entity, Warner Bros. Discovery, Inc., as a streaming-market force by touting its existing subscriber numbers and investment plans. But WBD omitted that 10 million of those "subscribers"—11 percent of WarnerMedia's reported subscribers of 95.6 million, or more than double the standard materiality threshold of 5 percent and the equivalent of more than *two years'* worth of subscriber growth—were **non-paying** customers destined to drop off because they received their subscriptions for free through bundled services, or were subscribers to non-core WBD products. And WBD omitted that WarnerMedia had already burned through its most valuable sources of cash flow—licensing its rich content and producing blockbuster theatrical releases—in a failed attempt to compete with Netflix on subscriber numbers. Those omissions made WBD's securities offering documents misleading under the minimal pleading burdens for violations of Section 11 and Section 12(a)(2) of the Securities Act.

When the truth was revealed that WBD was *not* positioned to compete with leading streaming platforms as had been promised, the market capitalization for WBD stock was cut nearly in half. Investors the Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio ("Plaintiffs") suffered damages from the losses to their stock and brought this action on behalf of themselves and similarly situated investors.

Section 11 of the Securities Act "impos[es] a stringent standard of liability" on defendants, with a correspondingly "minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). Section 12(a)(2) has a similar standard. However, the district court dismissed Plaintiffs' suit on the basis that it was not even plausible that WBD's offering documents were misleading. The court reached that conclusion only by imposing a higher pleading burden than allowed by the Federal Rules of Civil Procedure. The court impermissibly disregarded essential allegations demonstrating that the offering documents included misleading statements about the number of true, paying subscribers and the status of WarnerMedia's previous attempts

to compete in the streaming market by sacrificing its lucrative licensing arrangements.

## STATEMENT OF THE CASE

**A.  The "Streaming Wars" Pit Traditional Content Producers Like Warner Brothers Against Insurgent Content Distributors Like Netflix.**

The entertainment industry has been upended by the "streaming revolution," a technology-driven fundamental shift in how entertainment content is delivered away from television networks, theaters, and video rental services—and onto online platforms that stream content directly to consumers. Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything Is About to Change*, N.Y. TIMES (Nov. 18, 2019), https://tinyurl.com/2uk632n2. That revolution has upset the existing industry pecking order, bringing to the fore innovative streaming platform providers like Netflix and Amazon at the expense of traditional content distributors and their established entertainment content producers like Warner Brothers and HBO.

### 1.  The Distinction Between Content Producers and Distributors in the Economics of the Entertainment Industry.

As in other markets for artistic goods, the entertainment industry has historically been segmented between content producers and content

distributors. *See* Richard E. Caves, *Contracts Between Art and Commerce*, 17 J. ECON. PERSPS., Spring 2003, at 73. Content ***producers*** create new entertainment content, like movies and television shows. Content ***distributors*** market that content to paying consumers via distribution channels—e.g., movie theaters, cable television services, and, in recent years, online streaming platforms.

This distinction between content producers and distributors has roots in both the market's natural characteristics and the industry's history. Because movies and television shows are artistic content, the ultimate demand by consumers for them is highly unpredictable. *See* Caves, *supra*, at 74; Adam Davidson, *How Does the Film Industry Actually Make Money?*, N.Y. TIMES MAG. (June 26, 2012), https://tinyurl.com/3kru5jhh ("[The] future predilections of moviegoers are especially opaque.").

Content distributors' business models, on the other hand, tend to rely on market metrics that are more quantifiable. Distributors make money by increasing their distribution volume and competing with other distributors to host the best content. Distributors thus often aim to

minimize the costs of distribution and can generate significant profit margins only at immense distribution scale.

Historically, content producers—including Warner Brothers—sat at the top of the industry food chain, with sizable profit margins that fueled content production. *See* GERALD MAST, THE MOVIES: A SHORT HISTORY 296 (5th ed. 1996). Tracing back to the 1948 Paramount Decrees—a series of antitrust consent orders entered into with five major Hollywood studios (Warner Bros., Paramount Pictures, 20th Century Fox, Universal Pictures, and Columbia Pictures, i.e., the "Majors") and other entertainment industry players after the Supreme Court's decision in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)—content distribution through movie theaters was kept formally separate from content production. Content distribution historically earned smaller margins that were alone insufficient to finance the capital-intensive costs of producing competitive content. *See* HAROLD L. VOGEL, ENTERTAINMENT INDUSTRY ECONOMICS: A GUIDE FOR FINANCIAL ANALYSIS 39, 188 (4th ed. 1998).

2. <u>The Dramatic Consequences of the Rise of Streaming Platforms like Netflix and Amazon.</u>

The streaming revolution upset this old order. The advent of online video streaming technology dramatically lowered the cost of distribution and enabled the collection of vast amounts of market information with which to tailor content offerings to consumers' preferences. S. Abraham Ravid et al., *The Economics of Filmed Entertainment in the Digital Era*, 45 J. CULTURAL ECON. 157, 161 (2021). Streaming pioneers like Netflix leveraged these technological advantages to develop massive subscriber bases, which generated enough cash flow to invest in original content production designed to meet consumer preferences at unprecedented levels of detail.

As Netflix's founder explained, the company's innovation was grounded in its rejection of the traditional "view in Hollywood that certain people were the gifted tastemakers" in favor of an approach that would "follow the data wherever it took them." FELIX GILLETTE & JOHN KOBLIN, IT'S NOT TV: THE SPECTACULAR RISE, REVOLUTION, AND FUTURE OF HBO 133 (2022); *see also* Amol Sharma, *Amazon Mines Its Data Trove to Bet on TV's Next Hit*, WALL ST. J., (Nov. 2, 2013), https://tinyurl.com/mr3na6e7. Netflix's "empirical" approach to

identifying consumer preferences led the company to grow its subscriber base immensely. *Id.*

The approach worked. "[B]etween 2006 and the fall of 2021, Netflix's market cap would soar from $1.4 billion to over $300 billion." GILLETTE & KOBLIN, *supra*, at 182. Cash-rich from its distribution prowess, Netflix began to re-invest its profits in developing original content along the same consumer-friendly lines on which it grew devoted subscribers. The end goal was to invert the entertainment industry's traditional hierarchy: a distributor becoming a content producer. Netflix executives stated plainly that their "goal [was] to become HBO faster than HBO can become us." *Id.* at 267.

## B. WarnerMedia Historically Succeeded As a Content Producer Licensing Content to Third-Party Distributors.

While Netflix and Amazon rapidly expanded their subscribers, WarnerMedia was slow to respond.

Warner Brothers is one of the most successful entertainment content producers in American history, producing such Hollywood classics over the decades as "Casablanca," "Batman," "The Lord of the Rings" trilogy, and the "Harry Potter" series, among many others. *See*

*Warner Bros.: 100 Years, 100 Essential Movies*, Rotten Tomatoes https://perma.cc/8EFJ-WD6V (last visited May 9, 2024). Over the course of its history, Warner Brothers also expanded its content library by acquiring the Metro-Goldwyn-Mayer film library (e.g., "Wizard of Oz," "Gone with the Wind," "Rocky") and HBO, the producer of hit television series like the "Sopranos" and "Game of Thrones." JA34–35 (Compl. ¶ 31).

Over time, HBO "bec[a]me one of the most important components of the WarnerMedia library." JA35 (Compl. ¶ 32).[2] Like other content producers, HBO's business model was to develop or purchase content that it would then license to cable providers. JA35–36 (Compl. ¶ 34). HBO was a "wholesaler" and "never had a direct relationship with [its] customers." JA35–36 (Compl. ¶ 34).

Also like a traditional content producer, HBO focused on its competency of creating entertainment content with rich artistic value. HBO "put tremendous trust into its creative staff and content creators,

---

[2] Together, the various brands associated with Warner Brothers operated under corporate parents such as Warner Communications, Time Warner, and, after the acquisition of Time Warner by AT&T in 2018, as WarnerMedia.

without performing much research about whether the content would be popular." JA36 (Compl. ¶ 35). "HBO executives basically just had to wing it." JA36 (Compl. ¶ 35). But that strategy worked because HBO was a content producer focused on producing the best, most artistically original content it could.

As Netflix began to rise, WarnerMedia's then-parent entity, Time Warner, considered acquiring Netflix, but company leadership ultimately dismissed Netflix's new internet-based distribution model as "a bunch of claptrap" and a "flash in the pan." GILLETTE & KOBLIN, *supra*, at 181–82. Executives were worried that "investing in such a prominent tech company would be sure to upset their partners in cable and satellite distribution," which then serviced WarnerMedia. *Id.*

As a media content producer, Warner Brothers historically generated most of its revenue by selling produced content to third parties. Warner Brothers' traditional dominance reflected its position as one of the content-production "Majors" in the economics of the video and home entertainment market. But as streaming platforms like Netflix and Amazon grew, they increasingly eroded WarnerMedia's market share.

**C.**  **At the Onset of the "Streaming Wars," WarnerMedia Previously Attempted to Compete with Leading Distributors but Failed.**

Content producers like WarnerMedia were not the only industry players suffering from the rise of streaming platforms like Netflix. Cable and satellite network providers—companies like AT&T—that formerly served as the primary distributors of content also faced new challenges.

Streaming platforms like Netflix provide software services, which are low marginal cost for the company. *See* Travis Kavulla, *The Economics—and Politics—of Broadband*, 2 AM. AFFAIRS, Winter 2018, at 87, https://tinyurl.com/3cnt5bcx. But the internet access on which streaming software operates is provided by cable and satellite networks, which are far more capital-intensive and expensive. Network providers like AT&T thus bore asymmetric costs as Netflix grew and, at peak times, generated "more than a third of all internet traffic in North America." *Id*. To remedy this disparate outcome, network providers needed to capture the upside of internet that Netflix had proven exists by "leverag[ing] their networks to earn additional revenue from the sharing of information that they produce or curate." *Id*. In large part for that reason, AT&T bought Time Warner (then the corporate parent for WarnerMedia) with the

prospect of creating its own streaming offerings to compete with Netflix. *Id.*; JA41 (Compl. ¶ 51).

WarnerMedia's original preference was not to compete in the streaming market. After all, WarnerMedia, with HBO as a flagship, was a preeminent content producer, not a distributor. "Charging into the streaming fray would mean putting billions of dollars in profit from existing cable networks … at risk," "[b]uilding video platforms of the size needed to compete with Netflix and Amazon would be frightfully expensive," "[a]nd mastering the underlying technology would require a sharp learning curve." Barnes, *supra*. As a former vice president for HBO's consumer technology put it, "our transformation to a digital company was going to be a bloody campaign." GILLETTE & KOBLIN, *supra*, at 239. But under AT&T's prerogative, WarnerMedia undertook to find its footing in the new realm of streaming services alongside Netflix and Amazon.

To compete with Netflix, AT&T leveraged WarnerMedia's historic content library. AT&T "put all WarnerMedia content on a single streaming service" in order to "channel as many subscribers as possible." JA37 (Compl. ¶ 40). To do that, WarnerMedia terminated licensing

agreements that delivered WarnerMedia content to third party providers so that consumers would then have to subscribe to its streaming service if they wanted to watch WarnerMedia's popular content library. JA37 (Compl. ¶ 40). The WarnerMedia streaming product would eventually be named "HBO Max." JA36 (Compl. ¶ 38).

WarnerMedia's streaming products were not economical and failed to compete. HBO Max struggled to gain traction from the start. JA37 (Compl. ¶ 42). Technical difficulties prevented consumers from accessing the app. JA37 (Compl. ¶ 42). WarnerMedia also failed to solidify distribution agreements with smart TV manufacturers so that consumers could access the service on their TVs, missing out on over 40 million consumers who otherwise could have easily accessed HBO Max from their televisions. JA37 (Compl. ¶ 42). WarnerMedia brought on a new CEO who "strongly believed that streaming was critical to HBO's future" and "doubled-down" on "efforts to drive subscribers to HBO Max." JA38 (Compl. ¶ 43). And, in a "bold and controversial move," WarnerMedia announced its entire 2021 film slate would be released on HBO Max the same day as the theatrical releases, eschewing the

established practice of releasing in theaters first, drawing movie-goers willing to pay more to see a feature film early. JA38 (Compl. ¶ 43).

WarnerMedia was attempting to pull off the reverse of what Netflix had: a historic content *producer* trying to develop the technological prowess of a modern streaming platform *distributor*. But WarnerMedia's content-producer business model did not permit an efficient shift to distribution. WarnerMedia's streaming products did not meaningfully cut into competitors' market shares. These moves came at a high cost. WarnerMedia forfeited a significant amount of revenue that it had previously generated through licensing its content to other providers. JA38 (Compl. ¶ 44).

Despite the significant capital AT&T sunk into its development, HBO Max "lagged behind" Netflix and Disney. JA58 (Compl. ¶ 110). By 2021, WarnerMedia reported that it had 74 million subscribers to HBO Max and HBO. By contrast, Netflix reported 214 million subscribers, and Disney 118 million. JA58 (Compl. ¶ 110).

AT&T's experience with the streaming wars went so poorly that it began to seek an exit. In February 2021, it spun off DirecTV to a private equity group. When it later sold WarnerMedia to Discovery via the

Merger, AT&T effectively signaled its withdrawal from the entertainment industry. JA43 (Compl. ¶ 60).

## D. Pre-Merger, Discovery Was a Middle-Market Television Network Company with Little Distribution Prowess.

Meanwhile, Discovery—originally founded as the Discovery Channel—was "largely considered a second-tier media company." JA38–39 (Compl. ¶¶ 45–46). Discovery's most well-known brands included the TV channels and programming of HGTV, Food Network, TLC, Animal Planet, Investigation Discovery, Travel Channel, and Science. JA38–39 (Compl. ¶ 45). Discovery had recently launched a streaming service, "Discovery+," that its CEO David Zaslav pitched would "provide viewers with 'ambient noise,' *i.e.*, content that would play in their backgrounds while they attended to other matters." JA39–40 (Compl. ¶ 48). As of 2021, Discovery's direct-to-consumer subscribers totaled an insignificant 20 million, far below other streaming services. JA39 (Compl. ¶ 45).

Nonetheless, Zaslav recognized that the future of the media business lay in streaming services and thus launched an aggressive attempt to grow Discovery's streaming subscriber base by acquisition. JA39 (Compl. ¶¶ 46–47).

Zaslav had recognized HBO as the crown jewel of WarnerMedia's assets, and dreamed of sitting at its helm. Once the Merger was announced, Zaslav "took up every chance he could get to talk up the network," saying, "My gosh, HBO. … Our ambition is that those three letters, everywhere in the world, people are going to say that's the place to go to see great stories, great talent, and just have some fun." He further gushed, "To me, HBO was like the gravitational pull into this industry." JA40 (Compl. ¶ 50). As "AT&T's challenges mounted," Zaslav "waited for the right moment to rekindle [a] conversation" with AT&T's CEO, John Stankey, that would ultimately fulfill Zaslav's dreams of leading HBO. JA41 (Compl. ¶ 52).

## E.  Discovery Successfully Persuaded AT&T to Offload WarnerMedia via the Merger.

As WarnerMedia's competitiveness in the streaming market faltered, AT&T lost considerable sums of cash. JA38, 40–41 (Compl. ¶¶ 44, 51). Observing this vulnerability, Zaslav began a campaign to convince AT&T to sell WarnerMedia to Discovery. JA41 (Compl. ¶¶ 52–53).

Beginning in March 2021, over the course of several weeks, Zaslav and Stankey and teams from Discovery and AT&T met to discuss terms of a combination of WarnerMedia and Discovery. JA41 (Compl. ¶¶ 53–54). The companies eventually entered into a non-disclosure agreement and provided each other access to virtual data rooms for conducting due diligence. JA42–43 (Compl. ¶¶ 56–58). Virtual data rooms in transactions like the Merger typically include a comprehensive set of documents for the subject of the acquisition, including company financials, profit and loss statements and projections, business plans, product information, market research and competitive analysis. JA42–43 (Compl. ¶¶ 57–58). Senior managers from Discovery and AT&T also met in person to discuss prospective financial information. JA42 (Compl. ¶ 56).

Discovery and AT&T announced the Merger on May 17, 2021, and, after receiving the requisite regulatory and shareholder approvals, the Merger closed on April 8, 2022. JA43–44 (Compl. ¶¶ 60–62). In connection with the Merger, Discovery issued a registration statement on Form S-4 and a Joint Proxy Statement/Prospectus and Form 424(b) (the

"Offering Documents"). JA25–26, 46–48, 50 (Compl. ¶¶ 1, 69, 73–74, 76–77, 84).

## F.  Discovery Convinced Investors That Its Acquisition of WarnerMedia Would Position WBD to Compete with Leading Distributors.

### 1.  WBD Touted Its Subscriber Numbers in the Subscriber Statements.

Zaslav declared that the new, combined company would "compete with leading streaming services." JA57 (Compl. ¶ 106). In the streaming-platform market, "the key asset" is subscribers. JA55–56, 60 (Compl. ¶¶ 104, 118). Market analysts said they would be "closely tracking [WBD's] subscriber acquisition metrics for any sign of increasing or diminishing traction." JA60 (Compl. ¶ 118). WBD's investor pitches accordingly leaned hard into their subscriber projections, which would build off the historical base-subscriber numbers.

Prior to the Merger, HBO and HBO Max "lagged behind" Netflix and Disney. JA58 (Compl. ¶ 110). By 2021, WarnerMedia reported that it had 74 million subscribers to HBO and HBO Max. Netflix reported 214 million subscribers, and Disney 118 million. JA58 (Compl. ¶ 110). WarnerMedia, however, convinced investors that it could catch up,

stating that, by the end of 2025, it expected HBO and HBO Max to have between 120 million and 150 million subscribers. JA58 (Compl. ¶ 111).

In the Offering Documents, WBD took a more aggressive tack. JA60–61 (Compl. ¶ 120). The Registration Statement and Prospectus reported that "the total subscribers for HBO and HBO Max was 69.4 million" and 20 million for Discovery—a total of 89.4 million subscribers as of September 30, 2021. JA60–61 (Compl. ¶ 120). The Form 424(b) reported 73.8 million subscribers for HBO/HBO Max and 22 million for Discovery—a total of ***95.8 million subscribers*** as of December 31, 2021. JA61 (Compl. ¶ 120). These are the **Subscriber Statements** that Plaintiffs challenge. They were material to investors because they described the base of subscribers on which the combined company hoped to achieve its goals.

Zaslav ran with the reported historical subscriber numbers, declaring that WBD was already "almost at 100 million now." JA59 (Compl. ¶ 115). WBD's ability to claim a triple digit number was important to investors, as it showed that WBD—simply by completing the Merger—was poised to become the third largest streaming company

in terms of subscriber numbers, nipping at the heels of Netflix and Disney+. JA58–59 (Compl. ¶¶ 112–13).

With the credibility of a nine-figure subscriber number, Zaslav announced that WBD's focus was to achieve what he called "the Holy Grail," of "200 million, 300 million subscribers." JA59 (Compl. ¶¶ 115–16); *see* Claudia Eller & Cynthia Littleton, *How David Zaslav Plans to Combine Discovery and WarnerMedia to Unleash 'Shock and Awe' on the Streaming Wars*, VARIETY (Dec. 8, 2021), https://perma.cc/5X6H-LA92. Based on HBO and HBO Max's new, faster-growing subscriber rate, Zaslav estimated that WBD would hit 200 million subscribers "three years from now." JA59–60 (Compl. ¶ 117). WBD's CFO declared his "confidence on our ability to generate these numbers." JA57 (Compl. ¶ 107). Zaslav also declared: "I think this deal will be the first sentence of my obituary." JA40 (Compl. ¶ 49).

> 2. In the Third-Party Licensing Statements and Direct-to-Streaming Statements, WBD Touted Its Plans to Make a Streaming Pivot with WarnerMedia.

Discovery's plan was to use WarnerMedia's cash flows to invest in growing its subscribers to WBD's streaming services. JA55–57 (Compl. ¶¶ 104–06). Competitors like Netflix had spent considerable sums to

develop their subscriber bases. JA56 (Compl. ¶ 105). As Zaslav explained on an earnings call in February 2022, WarnerMedia was a "formidable" "content arms dealer[]" and "content maker and content owner" because of its "over 100 active series being sold to over 20 platforms and outlets," which "generat[e] significant revenue, free cash flow and most importantly, optionality" for WBD to deploy toward streaming. JA68 (Compl. ¶ 142).[3] The Offering Documents emphasized that WBD would be able to monetize WarnerMedia's content to "generate increased free cash flow … to fund additional strategic growth investments" such as in subscriber acquisition. JA57 (Compl. ¶ 108).

The Offering Documents thus portrayed WarnerMedia's existing business as *not* having already leveraged WarnerMedia's content to generate streaming subscriber growth for HBO and HBO Max. The Offering Documents stated that "[t]he television and film programming content that the WarnerMedia Business produces is also licensed to third

---

[3] This statement by Zaslav constituted a "prospectus" for purposes of Section 12(a)(2) of the Securities Act because it was transcribed and filed with the Securities and Exchange Commission as a written communication made in connection with and relating to the Merger pursuant to 17 C.F.R. § 230.425.

parties for use as part of their various video services and platforms." JA65 (Compl. ¶ 135). The Registration Statement also declared that one of the "risk factors" for the new entity was that WBD's "[f]ailure to renew … or termination of the WarnerMedia Business's content licenses and similar distribution agreements may cause a decline in WBD's revenue." JA66–67 (Compl. ¶ 139). These are the **Third-Party Licensing Statements** Plaintiffs challenge.

The Offering Documents also portrayed WarnerMedia as not yet having already leveraged its feature films for direct-to-consumer streaming. The Offering Documents stated that "WarnerMedia's content revenues consist primarily of licensing feature films for initial theatrical exhibition," among other revenue streams. JA75–76 (Compl. ¶ 171). They also stated that "WarnerMedia produces and releases feature films for initial exhibition in theaters, on HBO Max and, in 2021, simultaneously in theaters and HBO Max domestically." JA76 (Compl. ¶ 173). These are the **Direct-to-Streaming Statements** Plaintiffs challenge.

## G. The Market Reacted Negatively When WBD's Poor Competitive Footing Was Revealed.

### 1. The Subscriber Statements Overstated the Number of "True Paying" WBD Subscribers by 11 Percent.

The Offering Documents' subscriber numbers were materially misleading. In fact, WBD did not have "almost 100 million," or 95.8 million, subscribers, as reported. The Offering Documents inflated WBD's true subscribers because the subscriber numbers they reported included **10 million non-paying** HBO/HBO Max subscribers who received their subscriptions for free through a bundled service offered by AT&T and subscribers to "non-core" WBD products.

WBD itself explained the existence of these 10 million non-paying and other "subscribers"—but only *after* the Merger closed, when WBD's CFO Gunnar Wiedenfels announced:

> [W]e have made the following key adjustments that totaled 10 million subscribers. *First*, the HBO Max subscriber number historically included certain unactivated subscribers under the AT&T Mobility distribution agreement. Consistent with legacy Discovery policy, we will exclude such unactivated subscribers going forward. Second, … we will exclude non-core D2C subscribers outside of the Discovery+ or HBO Max products from our account, such as subscribers of MotorTrend, Eurosport Player and a few smaller other products.

JA62 (Compl. ¶ 124). WBD's CEO and President of Global Streaming and Games further elaborated that "**[t]he goal**" of removing these 10 million subscribers from the previously reported subscriber counts was "to provide [investors] with a **clear and transparent number of *true paying subscribers* to our core service**." JA62 (Compl. ¶ 125). In other words, the Offering Documents' earlier reported total subscribers included 10 million accounts that were not "true paying" subscribers, and thus the figure was not "clear and transparent." Accordingly, WBD's all-important subscriber base figures were misleadingly presented. WBD was forced to revise its projected subscribers for 2025 downward to 130 million—far short of the 200 million Zaslav had confidently asserted in the Offering Documents. JA64 (Compl. ¶ 130).

Nowhere did the Offering Documents disclose that 10 million of the "subscribers" were non-paying customers who had received the HBO/HBO Max subscription for free. The Offering Documents stated only, in a run-on footnote, that HBO/HBO Max subscriber count included "accounts that have access to HBO Max through a wholesale distributor (including wholesale subscribers and subscribers receiving access through bundled services that may not have signed in)." JA61 (Compl.

¶ 122). Investors had no way of knowing that this meant some subscribers were nonpaying.

Analysts and investors were surprised by WBD's revision to its previously disclosed subscriber numbers. JA63–64 (Compl. ¶¶ 127–31). Because the non-paying customers automatically "got the service as part of [AT&T's] distribution bundle," analysts like JP Morgan "expect[ed] the revenue associated with never-activated AT&T customers to degrade fairly quickly." JA63 (Compl. ¶ 129). According to analysts, the revised subscriber counts were "deflating" and showed that "WBD is likely not competing at the level of [Disney] and [Netflix] globally." JA63–64 (Compl. ¶¶ 128, 130).

Demonstrating the crucial role historical subscriber counts played, WBD's stock fell *16.5 percent in just one day* after the change in subscriber count was disclosed. JA95 (Compl. ¶ 235).

> 2. The Third-Party Licensing Statements and Direct-to-Consumer Film Statements Omitted that WarnerMedia Had Already Monetized Its Content in an Attempt to Acquire Streaming Subscribers.

The Offering Documents' statements that WarnerMedia primarily earned its revenue from third-party licensing and movie theater exhibitions were also misleading.

26

When the Merger was announced, Zaslav told investors that WBD would generate $14 billion in annual earnings before interest, taxes, depreciation, and amortization ("EBITDA"). JA54–55 (Compl. ¶ 100). As discussed previously, *see supra* subpart F.2, Zaslav planned to use that margin to compete for subscribers. But soon after the Merger closed, WBD reported a $2 billion *reduction* in EBITDA that shocked the market. JA66 (Compl. ¶ 137). The reason for this surprise loss so soon after the Merger, as WBD and Zaslav themselves explained, was that WarnerMedia had cut off its lucrative content licensing in an effort to draw subscribers to its streaming services, with no offsetting revenue gains. JA66 (Compl. ¶ 137). In other words, well before the Merger had closed, and in contravention of the statements made in the Offering Documents, WarnerMedia was already trying to execute the very plans Zaslav had for WBD—but was failing.

*First*, WarnerMedia had, secretly and without public announcement, halted licensing its content to third parties in favor of providing its content solely on the HBO Max streaming service. JA66 (Compl. ¶ 136). That made the Third-Party Licensing Statements misleading. Investors reading those statements would not have

27

recognized that WarnerMedia had already terminated its lucrative practice of licensing its content to a wide variety of third-party service providers, including non-affiliated digital distributors. JA66 (Compl. ¶ 136).

Like the change in total subscribers, this change to WarnerMedia's content licensing was disclosed only *after* the Merger closed. JA66 (Compl. ¶ 137). During WBD's earnings call on August 4, 2022, Wiedenfels explained that WarnerMedia had experienced a $2 billion decline in EBITDA and a decline of $49 million, or 25 percent, in WarnerMedia's revenues from third quarter 2021 to third quarter 2022—largely because WarnerMedia had "halted" content licensing. JA66 (Compl. ¶¶ 137–38). He stated that "new content licensing deals to third parties were largely halted and content was, in general, made exclusive to HBO Max." JA66 (Compl. ¶ 137).

*Second*, WarnerMedia had lost revenues from feature film releases in theaters by releasing movies directly on HBO and HBO Max, including into 2022. JA76 (Compl. ¶¶ 172, 174). WarnerMedia's decision to launch Direct-to-Streaming movies made statements touting its theatrical releases (i.e., the Direct-to-Streaming Statements) misleading.

28

Analysts were surprised by the news that WarnerMedia had halted its content licensing. JA69 (Compl. ¶ 145). Investors were hyper-focused on WBD's free cash flows. JA70 (Compl. ¶ 149). WBD's future prospects rested on the company being able to successfully utilize the cash flows from WarnerMedia's rich content to acquire subscribers. The news that WarnerMedia had already attempted the same transition, to no avail and with financial harm to the company, was a major setback.

As a result of these revelations, WBD common stock fell 16.5 percent, from $17.48 where it had closed on August 4, 2022, to close at $14.59 per share, on August 5, 2022. JA95 (Compl. ¶ 235). In total, the market capitalization of WBD declined from $60.1 billion on April 11, 2022 (the date that WBD securities were first publicly traded) to $35.4 billion on August 5, 2022 (following disclosures of the reasons for WBD's downward revisions of expected EBITDA and cash flow). JA29–30 (Compl. ¶ 14).

In other words, as a result of full disclosure regarding the statements challenged in this lawsuit, WBD's market capitalization dropped by over forty percent.

**H.    The District Court Proceedings Below.**

Plaintiffs filed the operative Complaint on February 15, 2023. Defendants filed their motions to dismiss on April 7, 2023. Plaintiffs opposed on May 5, 2023, and Defendants filed reply briefs on June 2, 2023.

On February 5, 2024, the Honorable United States District Judge Valerie Caproni issued an Opinion and Order granting Defendants' motions to dismiss. SPA1–29. Plaintiffs timely filed a notice of appeal on March 4, 2024. JA1061–63.

## SUMMARY OF THE ARGUMENT

In dismissing the Complaint, the district court committed a decisive error that requires reversal. Because Plaintiffs' claims do not sound in fraud, the court was required to apply Rule 8(a)'s "notice" pleading standard, not the heightened pleading standards applicable to securities fraud and common-law fraud cases. While the court purported to apply Rule 8(a), it actually imposed greater pleading burdens than Rule 8(a) permits. Properly evaluated under Rule 8(a), the Complaint states a claim and should not have been dismissed.

Plaintiffs allege violations of Section 11 and Section 12(a)(2) of the Securities Act, which provide for an issuer's strict and negligent liability, respectively, for misleading statements and omissions in securities offering documents. Plaintiffs alleged that Defendants misled investors by omitting key facts about the Merger that were necessary to make the Offering Documents not misleading. The applicable pleading standard for the Complaint is Rule 8(a), which requires only notice pleading. On a Rule 12(b)(6) motion to dismiss, the court must accept the Complaint's factual allegations as true and draw reasonable inferences in favor of Plaintiffs. Thus, Plaintiffs are only required to allege that the Offering Documents contain a false or misleading statement, and the sufficiency of these allegations is analyzed under Rule 8, with all reasonable inferences being drawn in their favor.

The district court failed to follow those requirements for three of Plaintiffs' claims.

**Subscriber Statements** (Part II, *infra*). The Complaint alleges that the Offering Documents' disclosure of WBD's "total subscribers" was misleading because it omitted the number of non-paying HBO and HBO Max subscribers and non-core Discovery subscribers. Investors were not

told that **any** of WBD's "total subscribers" were non-paying. Even if investors could have discerned that *some* of the subscribers were non-paying from the vague definition of "total subscribers" in the Offering Documents, investors had no way of knowing the number of non-paying subscribers. Thus, they were left with the impression that the number of those non-paying and non-core subscribers was not material. But it was: these non-"truly paying subscribers" numbered over **10 million**, or 11 percent of WBD's reported total subscribers (a figure that amounted to 2.5 years' worth of subscriber growth).

In dismissing this claim, the district court summarily concluded that the Offering Documents' omission of these 10 million "subscribers" was not misleading because the Offering Documents elsewhere disclosed that WBD's methodology for tabulating "total subscribers" mentioned it included some "unactivated" subscribers. SPA14–15.

That conclusion erroneously drew inferences against Plaintiffs. *First*, the district court ignored the Complaint's allegation that the Offering Documents' description of the methodology used to compute subscriber numbers was misleading. The Offering Documents disclosed only that the subscriber count included some "subscribers receiving

access through bundled services that may not have signed in." JA61 (Compl. ¶ 122). Plaintiffs alleged that this was misleading because, in reality, these "subscribers" had not merely failed to sign in—but in fact were ***non-paying*** and thus were unlikely ever to sign in (and thus actually *pay* for their subscriptions).

Without explanation, the court adopted Defendants' euphemistic characterization of these non-paying accounts as merely "unactivated" subscribers, giving the false impression that a small number of paying subscribers simply hadn't yet activated their accounts. SPA14. Under that re-framing, the court concluded that the Offering Documents' disclosure that their total subscribers included non-"signed in" customers was all investors were entitled to know. That adoption of Defendants' self-serving framing—and rejection of Plaintiffs' reasonable, plausible contrary framing—was the exact opposite of what Rule 8(a) requires.

*Second*, even if some investors could have divined that the Offering Documents' reference to "unactivated" subscribers actually meant that these subscribers were not "true paying," the Offering Documents omitted that a whopping ***10 million*** subscribers fell into this category. Thus, the number of "true paying" customers was materially reduced

from 95.6 million to 85.6 million. That figure would not have allowed Zaslav to tout WBD's sought-after "nearly triple-digit" subscriber number of "almost 100 million" subscribers. Further, Defendants emphasized "recent" subscriber growth of 13 million (from 61 million to 74 million) but, in fact, the growth of *paying* subscribers was a paltry 3 million, demonstrating a lack of momentum in subscriber growth. It is more than plausible that this omission was materially misleading because it led investors to believe WBD had a noticeably stronger subscriber base than it actually did.

**Third-Party Licensing Statements** (Part III, *infra*). The district court dismissed Plaintiffs' claim that the Offering Documents misled investors by touting the profitability of WBD's third-party licensing abilities when in reality it had already "largely halted" third-party licensing deals. SPA16–18. Here, too, the court failed to draw reasonable inferences in favor of Plaintiffs.

*First*, the court held that Plaintiffs had not adequately alleged that WBD's touting of third-party licensing was misleading because the Complaint did "not allege the extent to which new content licensing deals had actually been halted" and did not "specify whether" that meant WBD

"had quit renewing existing deals" or had "stopped initiating new deals." SPA17 n.20.

That imposed a greater particularity requirement than Rule 8(a) permits. First, the Complaint alleges that *Defendants themselves* admitted, after the Merger closed, that the licensing deals had been "largely halted" prior to the Merger's close. Under Rule 8, it is plausible, then, that the licensing deals had, in fact, been largely halted, and no additional details are required. But even if more were required, the Complaint alleges that it was plausible that the halting of the licensing deals was material because Defendants stated that WBD lowered its financial estimates *because* WarnerMedia had "largely halted" licensing deals. It is a reasonable inference that those reductions must have already occurred and been substantial, given their financial harm to the company. It is unthinkable that WBD would have reported a $2 billion reduction in EBITDA, which its CFO attributed to reductions in third-party licensing, unless those reductions were substantial. Rule 8(a)'s notice pleading does not require Plaintiffs to further specify the precise "extent" to which WarnerMedia had stopped the deals or whether they were limited to new or existing deals. What matters is that the reductions

were evidently material, as shown by their financial consequences. Yet the court demanded more.

*Second*, the court held that, even if Plaintiffs established WarnerMedia had already halted third-party licensing, that fact wasn't material because WarnerMedia's efforts to release content exclusively on its streaming platform were already publicly known. SPA17–18. But in securities misstatement cases, decisions about the materiality of information must be deferred beyond the pleading stage as long as reasonable minds can differ on the information's availability and importance to investors.

The district court violated this requirement by inferring that investors were already aware that WarnerMedia had halted third-party licensing. The court pointed to a smattering of articles that Defendants introduced with their motion to dismiss that reported that WarnerMedia planned to release certain content exclusively on HBO Max. SPA18. The court concluded that this meant WBD investors "reasonably should already be aware" of the omitted facts. SPA18.

That conclusion erroneously drew inferences against Plaintiffs. The Complaint alleged that investors were *not* aware of the extent of

36

WarnerMedia's ceasing of its third-party licensing, in large part because Zaslav had announced Discovery's plan to use WarnerMedia's licensing revenues to fund its acquisition of streaming subscribers. The news items, some of which were dated from years before the class period, did not (and could not) rebut Plaintiffs' allegations. In any case, the court wrongly decided—once and for all, at the pleading stage—the materiality and availability of this information to a reasonable investor.

**Direct-to-Streaming Statements** (Part IV, *infra*). The district court dismissed Plaintiffs' claim that the Offering Documents were misleading when they stated that WarnerMedia's revenues "consist[ed] primarily" of licensing feature films for initial theatrical exhibition when, in reality, WarnerMedia had already "shifted away" from licensing theatrical films for theatrical distribution in favor of a direct-to-streaming approach. SPA20–23.

The court again drew a decisive inference against Plaintiffs. The court concluded that the Complaint did not "adequately allege[]" that WarnerMedia had actually made a direct-to-streaming shift because the Complaint relied on a post-merger statement by WBD that it was "making a strategic shift" back to "theatrical exhibition," which did not

37

directly prove that WBD had previously not prioritized theatrical exhibition. SPA21–22.

That imposed too high of a burden. It is reasonable to infer that WBD's declaration of its "shift" back to theatrical exhibition meant WarnerMedia previously did *not* prioritize theatrical exhibition. Indeed, the Complaint alleges that WarnerMedia lost considerable sums because of its direct-to-streaming initiative. The court failed to credit that statement or draw that reasonable inference in Plaintiffs' favor.

\*    \*    \*

The district court's errors in failing to apply Rule 8(a)'s notice pleading standard and follow Rule 12(b)(6)'s pleading-stage requirements were decisive. Under a properly applied Rule 8(a) and Rule 12(b)(6) standard, the Complaint states a claim for violations of Section 11 and Section 12(a)(2) of the Securities Act.

## STANDARD OF REVIEW

This Court reviews a judgment of dismissal pursuant to Rule 12(b)(6) *de novo*, assuming all facts alleged within the four corners of the complaint to be true and drawing all reasonable inferences in favor of the

plaintiff. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).

## ARGUMENT

### I. THE COMPLAINT IS SUBJECT TO RULE 8(a) AND THE MINIMAL BURDENS OF PLEADING VIOLATIONS OF SECTION 11 AND SECTION 12 OF THE SECURITIES ACT.

Plaintiffs claim that Defendants violated Section 11 and Section 12(a)(2) of the Securities Act by issuing materially misleading offering documents. Because these claims do not sound in fraud, they are subject to Rule 8(a)'s notice pleading standard.

Section 11 imposes liability on issuers of and signatories to a Registration Statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability under the same circumstances on sellers of securities by means of a prospectus. 15 U.S.C. § 77*l*(a)(2).

Sections 11 "impos[es] a stringent standard of liability" with "minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 381–82. Liability lies against "even … innocent misstatements." *Id.* at 382.

39

Section 12(a)(2) imposes similar requirements. *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009). "So long as plaintiffs plausibly allege that [WBD] … made material misstatements in its offering documents, they meet the relatively minimal burden of stating a claim pursuant to Sections 11 and 12(a)(2), under which, should plaintiffs' claims be substantiated, [WBD's] liability as an issuer is absolute." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).

Plaintiffs allege that Defendants violated Sections 11 and 12(a)(2) by misstating material facts in the Offering Documents. These claims do not sound in fraud and thus are subject to Rule 8(a). *See Blackstone*, 634 F.3d at 715; *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 1:11-cv-2700, 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Section 11 and 12 claims

are generally subject only to the relaxed pleading requirements of Rule 8.").[4]

Rule 8(a) requires only "notice" pleading. *Swierkiewicz v. Sorema NA*, 534 U.S. 506, 514 (2002). *Iqbal*'s "plausibility standard" requires the plaintiff to plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Blackstone*, 634 F.3d at 715.

Plaintiffs' claims are thus subject to Rule 8(a). The district court purported to apply Rule 8(a)'s notice pleading requirements, JA1031 n.14, but, as discussed next, in fact subjected the Complaint to a heightened standard.

---

[4] Defendants argued below that Plaintiffs' claims sound in fraud and are thus subject to Rule 9(b)'s heightened pleading standards. Memorandum of Law in Support of the WBD Defendants' Mot. to Dismiss ("Def.Dist.Ct.Br.") at 6–7, *OPERS v. Discovery, Inc.*, Case No. 1:22-cv-08171-VEC (S.D.N.Y. Apr. 7, 2023), ECF No. 87. The district court did not decide the issue but dismissed the Complaint under Rule 8(a). SPA11 n.14.

## II. WBD MATERIALLY MISLED INVESTORS BY MISREPRESENTING THE NUMBER OF ITS SUBSCRIBERS.

Under Section 11 and Section 12(a)(2), Offering Documents are materially misleading where they "omit material facts whose omission, in the light of what was stated would be misleading." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020). The Offering Documents omitted the fact that up to 10 million WBD subscribers were non-paying or subscribed to only non-core products. That was material because it was 11 percent of WBD's total subscribers, a critical metric for selling investors on its prospects.

Omitting this information was misleading because it gave investors the impression that the number of those non-paying and non-core subscribers was not material—as later proved when subsequent revelation of all the facts caused a sudden and dramatic drop in WBD's stock price.

### A. The Number of Non-Paying and Non-Core WBD Subscribers Was Material.

The fact that up to 10 million of WBD's purported subscribers were actually non-paying or were subscribed to non-core products was

material to investors. "Materiality … is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Blackstone*, 634 F.3d at 716–17.

Materiality is an "inherently fact-specific finding." *Basic Inc. v. Levinson,* 485 U.S. 224, 236 (1988). For that reason, "when a district court is presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material *unless* they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Blackstone*, 634 F.3d at 717. Courts consider both quantitative and qualitative factors in evaluating materiality. *Id*.

A reduction in true subscribers by 10 million was clearly material. As revealed by the market's reaction, a reduction of 10 million meant investors no longer believed that WBD was in a position to compete with Netflix and Amazon. JA58, 63–64 (Compl. ¶¶ 110–11, 127–131). While selling investors on the merger, Zaslav had repeatedly touted WBD's "almost 100 million subscribers"—a number in "triple digit" millions,

43

just like Netflix and Amazon—as the strong starting position from which the company would compete. JA58–60 (Compl. ¶¶ 112, 115, 119). Reducing subscribers by 10 million knocked WBD out of striking distance from that perception-critical triple-digit category.

Based on WBD's misleading estimate of almost 100 million subscribers, analysts projected subscribers would increase to between 120 and 150 million by 2025, or a minimum growth rate of 4 million subscribers per year. JA59 (Compl. ¶ 113). Under these projections, the loss of 10 million subscribers represented the erasure of **more than two years' worth** of subscriber growth. It also turned HBO's **recent** "significant increase" in reported subscribers—from 61 million to 74 million in 2021, JA58 (Compl. ¶¶ 110–11)—to a mediocre one, from 61 million to just 64 million, now underperforming even its 2019 projections. JA58 (Compl. ¶ 111).

No wonder the reduction was "deflating" news to investors when it was finally revealed. JA63 (Compl. ¶ 128). *See In re WorldSpace Sec. Litig.*, No. 1:07-cv-2252, 2008 WL 2856519, at *6 (S.D.N.Y. July 21, 2008) (holding that misstatements and omissions regarding "the problems with WorldSpace's subscriber count system could very well

have affected investment decisions" where defendants' subscriber count included "subscribers who ha[d] stopped paying for service" in light of the company's statements about the importance of subscription figures); *In re Globalstar Sec. Litig.*, No. 1:01-cv-1748, 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003). It meant that WBD would no longer be able to compete. JA95 (Compl. ¶ 234). As a result, WBD's stock plummeted 16.5 percent the day after the news was revealed, wiping out over $7 billion in market capitalization in one day. JA95 (Compl. ¶ 235).

For quantitative materiality, a "five percent numerical threshold is a good starting place." *Blackstone*, 634 F.3d at 717 (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009)). Ten million subscribers represented an 11 percent reduction of WBD's misleading "total subscribers" number, a critical measure for its future success. JA55–56, 60 (Compl. ¶¶ 104, 118). That easily clears the five-percent threshold for numerical statements—especially given the fact that this case is still at the threshold pleading stage.

**B.** **The District Court Erroneously Failed to Accept the Complaint's Facts and Draw Reasonable Inferences in Favor of the Plaintiffs.**

The district court failed to accept the Complaint's factual allegations and draw reasonable inferences in favor of the Plaintiffs as required by Rule 8(a) and Rule 12(b)(6). The court summarily concluded that the Offering Documents' omission of the number of non-paying and non-core subscribers was not misleading because they disclosed that WBD's methodology for tabulating "total subscribers" included those subscribers. SPA14. That conclusion erroneously drew inferences against Plaintiffs and also misunderstood the basis of their claim.

*First*, the Complaint alleges that the subscriber numbers included ***non-paying*** customers. JA27, 60–61 (Compl. ¶¶ 5, 120–21). The district court ignores this allegation completely and concluded that the Offering Documents provided investors with all the information they needed to know because "the methodologies clearly disclosed that WarnerMedia included ***unactivated*** accounts." SPA14. In fact, the Offering Documents disclosed only that the subscriber count included some "subscribers receiving access through bundled services that may not have signed in" JA61 (Compl. ¶ 122). A reasonable investor would have viewed

46

that as saying there were paying subscribers who simply had not yet signed in. But Plaintiffs' allegation is that this definition was misleading because, in reality, these so-called "subscribers" were *non-paying* and amounted up to 10 million customers—11 percent of WBD's total subscribers. JA27, 61–63 (Compl. ¶¶ 5, 121, 123, 125–26).

But the court drew the opposite inference. Without explanation, the court adopted Defendants' euphemistic characterization of these non-paying subscribers as merely "unactivated" subscribers. SPA13; Def.Dist.Ct.Br.9, 11. Under that improper re-framing in favor of Defendants and against Plaintiffs, the court concluded that the Offering Documents' disclosure that their total subscribers included non-"signed in" customers was accurate and "supplied the [P]laintiffs with all the information they needed." SPA15. That conclusion failed to draw the more-than-reasonable inference that these "subscribers" were non-paying, an inference drawn from Defendants' own admissions. Further, it is reasonable to infer that they would likely *never* pay. In other words, they were not merely "unactivated" (which, again, suggests they were paying but had simply not signed in yet)—they were in fact never going to activate, or pay. They had been handed a free sample for a product

47

that did not interest them. The court not only failed to accept Plaintiffs' allegations and the reasonable inferences flowing therefrom, as *Iqbal* requires, but affirmatively adopted competing interpretations proffered by Defendants. That was error.

*Second*, the district court's focus on the Offering Documents' disclosure of WarnerMedia's methodology for counting subscribers missed the point: Plaintiffs' allegation is that the Offering Documents' omission of the *number* of non-paying and non-core subscribers was materially misleading because it led investors to believe WBD had a stronger subscriber base than it did. The Offering Documents' disclosure that WBD's methodology for tabulating total subscribers included some of these so-called "unactivated" subscribers does not disclose their *number*. Compounding the misdirection, because WBD had a duty not to omit material facts that would make its Subscriber Statements misleading, a reasonable investor would have concluded that the number of "unactivated" subscribers must not have been material. The court's conclusion that the number's omission wasn't material failed to draw a reasonable inference in favor of Plaintiffs.

The Complaint alleged that the number of non-paying and non-core subscribers was material. In support, the Complaint pointed to analyst reactions alluding to the "deflating" subscriber counts that were "10% lower than telegraphed." JA63 (Compl. ¶ 128). Given analysts' surprise and concern, it is certainly "plausible" that investors were misled about WBD's historical subscriber numbers.

The district court never addressed these allegations. Instead, the court concluded that the Offering Documents' disclosure of the existence of unactivated and non-core accounts was not misleading because it disclosed "literally true" "accurate historical data" about subscribers that "supplied the [P]laintiffs with all the information they needed." SPA14–15. That conclusion drew an inference about investors' likely comprehension of the Offering Documents *against* Plaintiffs, not in their favor. Plaintiffs alleged that WBD's "literally true" total subscriber count omitted critical information necessary to make it not misleading.

Further demonstrating its *sub silentio* application of a higher pleading standard, to support that conclusion the court also erroneously relied on Section 10(b) cases that subjected plaintiffs to a heightened pleading standard than applicable here. SPA14 & n.17. The court

acknowledged that the Section 10(b) cases it relied on applied a heightened pleading standard. But the court still deemed those cases "instructive" for "whether the complained-of statements constitute material misstatements or omissions" because the "standard" was "essentially the same under Section 10(b), Section 11, and Section 12." SPA14 n.17. Thus, the court relied on Section 10(b) cases as authorities without accounting for how the heightened standard affected their analysis.

That was error. While Section 10(b) shares the same *element* of material misstatement or omission as Section 11 and Section 12, the same *pleading standard* does not necessarily apply. Unlike the Section 11 and Section 12(a)(2) claims here, Section 10(b) requires scienter, and thus Section 10(b) claims ordinarily sound in fraud and are subject to the heightened particularity requirements of Rule 9(b). *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003) ("Section 10(b) claims are claims of fraud."). And unlike Section 11 and Section 12(a)(2) claims, Section 10(b) claims are also subject to the heightened pleading standards established by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which require even further specific

50

allegations concerning misstatements. 15 U.S.C. § 78u-4(b)(1)(B); *compare* 15 U.S.C. § 77z-1 (no heightened pleading standard for Securities Act claims).

In accord with these enhanced pleading requirements, each of the Section 10(b) cases the court relied on to dismiss the Complaint's allegation that the omitted subscriber numbers made the Offering Documents materially misleading applied the heightened requirements of Rule 9(b) and PSLRA to the relevant material misstatement and omission pleadings. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) ("The Fund's complaint fell far short of [Rule 9(b)'s] standard … [and] does not comport with our exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading."); *In re Eros Int'l Secs. Litig.*, No. 1:15-cv-8956, 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) (dismissing the Complaint because plaintiff failed to allege that

reported figures were "plainly inaccurate").[5] Those authorities thus cannot apply here, where Rule 8(a)'s less onerous "notice" requirement is the applicable pleading standard.

This Court should reverse the district court's dismissal of Plaintiffs' Subscriber Statements claim.

## III. WBD MATERIALLY MISLED INVESTORS BY OMITTING THAT WARNERMEDIA HAD ALREADY HALTED ITS LUCRATIVE THIRD-PARTY LICENSING PRACTICE.

WBD also materially misled investors by omitting key material facts about WarnerMedia's existing and ongoing attempts to compete with leading streaming platforms—and the immense costs of those efforts. Prior to the Merger, WarnerMedia had largely halted its lucrative third-party licensing, at immense cost to the company. Omitting that fact was misleading in light of WBD's emphasis on the purportedly new direction Discovery's merger would take WarnerMedia, WBD's ability to

---

[5] The one Section 12 case the court cited, *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 171 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018), also applied Rule 9(b), not Rule 8(a), to the plaintiffs' claims and thus is inapplicable for the same reason.

use WarnerMedia's cash flows from content licensing to finance it, and the combined entity's prospects for competing.

### A. The Offering Documents' Omission of WarnerMedia's Shift Away from Third-Party Licensing Was Materially Misleading.

The Offering Documents did not disclose that WarnerMedia secretly had "largely halted" content licensing agreements, which was a critical and lucrative component of its business. JA65–66 (Compl. ¶¶ 134, 137). This omission rendered the Offering Documents' statements about third-party content licensing misleading. JA65 (Compl. ¶ 135) (WarnerMedia licenses its programming content to third parties); JA67 (Compl. ¶ 139) ("WBD will be dependent on the maintenance of such licensing and distribution agreements with such third parties"); JA68 (Compl. ¶ 142) ("Consider that Warner Brothers television has over 100 active series being sold to over 20 platforms and outlets. It's a content maker and content owner generating significant revenue, free cash flow[.]").

Investors would have no idea from these statements that WarnerMedia had, in fact, already "largely halted" the licensing agreements that provided a substantial portion of its described

"significant revenues." The statements thus were "made misleading by what the company did not disclose." *Solomon v. Sprint Corp.*, No. 1:19-cv-5272, 2022 WL 889897, at *6 (S.D.N.Y. March 25, 2022) (statements about "net additions" of customers were misleading in light of undisclosed slowdown).

The materiality of these facts speaks for itself. Materiality "is not much of a barrier to [Plaintiffs] prevailing on a Fed. R. Civ. P. 12(b)(6) motion," particularly where one might conclude that cancellation of the licensing deals "would constitute a substantial threat to earnings, if not to the entire venture." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 252 (2d Cir. 2014). Third-party content licensing deals comprised nearly 40 percent of WarnerMedia's revenues in 2021. JA65 (Compl. ¶ 132). WarnerMedia's cutting off these deals contributed to WarnerMedia having "virtually no free cash flow" and WBD revising annual EBITDA down by $2 billion. JA92–95 (Compl. ¶¶ 226, 230, 232). WBD's stock price dropped 16.5 percent the very next day. JA95 (Compl. ¶ 235).

Defendants reduced WBD's EBITDA and free cash estimates, in large part, because WarnerMedia lost revenue due to it cutting off licensing deals to pursue subscriber acquisition. JA66 (Compl. ¶ 137).

WarnerMedia's shift away from third-party content licensing meant less leverage for WBD to compete in the streaming market. The very strategy that Zaslav pitched to investors had, in fact, already been tried—and failed.

The district court's analysis of this claim demonstrates a fundamental misunderstanding of the allegations. The district court focused on whether WBD was required to "disclose changes to its business *plans*." SPA17. However, because the licensing programs had already been "largely halted" *prior* to the Merger, the omissions did not involve a change to future plans, but rather to *existing* "company policy at the time." *See Friedman v. Endo Int'l PLC*, No. 1:16-cv-3912, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (cited in SPA17). That existing company policy is what the Offering Documents misleadingly presented, and it makes these statements actionable.

## B. The District Court Again Erroneously Failed to Accept the Complaint's Facts and Draw Reasonable Inferences in Favor of the Plaintiffs.

The district court rejected Plaintiffs' claim that the Offering Documents misled investors by touting WBD's third-party licensing

when it instead had "largely halted" third-party licensing deals. SPA16–19. In doing so, the court made two decisive errors.

*First*, the court failed to accept or draw a reasonable inference in favor of Plaintiffs' allegation that WBD had already "largely halted" third-party licensing deals. Instead, the court held that Plaintiffs had not alleged that WBD's touting of third-party licensing was misleading because the Complaint did "not allege the extent to which new content licensing deals had actually been halted" and did not "specify whether" that meant WBD "had quit renewing existing deals" or had "stopped initiating new deals." SPA17 n.20.

That imposed an excessive requirement of particularity—one completely unnecessary to demonstrate a plausible claim. The Complaint alleged that WBD lowered its EBITDA and free cash flow estimates because WarnerMedia was losing revenue due to licensing deals that had been "largely halted." JA66 (Compl. ¶ 137). It is a reasonable inference that, if WBD was lowering earnings forecasts because of past reductions in third-party licensing, those reductions must have already occurred and been substantial. Rule 8(a)'s notice pleading does not require Plaintiffs to further specify the precise "extent" to which those agreements had

been halted or whether those reductions were to new or existing third-party licensing deals. The point is that they had been halted and that this was significant—and that alone is more than sufficient to state a plausible claim.

*Second*, the court held that even if Plaintiffs established WarnerMedia had already halted third-party licensing, that fact wasn't material because WarnerMedia's efforts to release content exclusively on its streaming platform was already publicly known. SPA17–18. But that approach again drew inferences against Plaintiffs.

A "complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material *unless* they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Blackstone*, 634 F.3d at 717. That is especially true where, as here, materiality hinges on the importance of *other* publicly available information that the issuer itself did not disclose. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

The district court violated these requirements by inferring that investors were already aware that WarnerMedia had halted third-party

licensing. The court pointed to news articles published by outlets like Hollywood Reporter, which were introduced by Defendants, reporting that WarnerMedia planned to release certain content exclusively on HBO Max. SPA18. The court concluded (again citing a Section 10(b) case subject to a higher pleading standard) that this meant WBD investors "reasonably should already be aware of it." SPA18.

That conclusion erroneously drew inferences against Plaintiffs. The Complaint alleged that investors were *not* aware of the extent of WarnerMedia's ceasing of its third-party licensing, in large part because Discovery announced that it planned to use WarnerMedia's licensing to fund its acquisition of streaming subscribers. JA55–57 (Compl. ¶¶ 104–06).

The Complaint also alleged that even expert financial analysts were surprised by the news that WarnerMedia had halted its content licensing. JA69 (Compl. ¶ 145). If analysts were surprised, it is more than plausible that investors were, too—yet the district court concluded the exact opposite. Sporadic news reports and statements not made by WBD itself, some published years before the class period, do not rebut these allegations, least of all at the pleading stage. *See United Paperworkers*

*Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[M]ere presence in the media of sporadic news reports" is not part of the "total mix," especially where "articles were few in number, narrow in focus, and remote in time"). That should have precluded dismissal.

The district court attempted to justify its course by re-characterizing its finding as negating WBD's "duty to disclose," rather than deciding that the information was not material. SPA18 & n.21. That redirection fails for three reasons. *First*, it is a distinction without a difference. By holding there was no duty to disclose, the court was necessarily concluding the information was not material—the very thing the court claimed it was sidestepping. That is because (1) whether a reasonable investor should *know* information and (2) whether information is *material* to a reasonable investor both require determining whether the information altered the "total mix of information" available to investors. *United Paperworkers*, 985 F.2d at 1199. Even the district court's leading authority provides no support for the proposed distinction. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (holding that a "reasonable shareholder" who had the relevant

"information readily available to him" meant that "reasonable minds could not differ as to the *immateriality of the omissions*").

*Second*, regardless of whether the duty to disclose could somehow be surgically separated and determined without touching on materiality, the district court still repeatedly drew factual inferences against Plaintiffs, as explained above.

*Third*, the publicly available information Defendants produced did not negate WBD's duty to disclose the omitted fact that WarnerMedia had halted its third-party licensing. WBD's duty to disclose arose from its "cho[ice] to speak" about its revenues from third-party licensing. *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022).[6] WBD's statements that it earned its revenue from third-party licensing and "would" lose revenues if it ended those arrangements were inconsistent, not "repetitive," with past public reports. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999) (publicly available information negates the duty to disclose to the extent that it will "excuse [the issuer] from new disclosures which reasonably

---

[6] *Vacated on other grounds*, No. 22-1165, 601 U.S. 257 (2024).

appear to be repetitive"). Defendants' statement that WBD *could* lose revenues from ending third-party licensing arrangements when it was *already* doing so was actionably misleading. *See Jinkosolar*, 761 F.3d at 251.

The Court should reverse the district court's dismissal of Plaintiffs' Third-Party Licensing Statements claim.

## IV. WBD MATERIALLY MISLED INVESTORS BY OMITTING THAT WARNERMEDIA WAS ALREADY FORGOING REVENUES FROM EXCLUSIVE THEATRICAL RELEASES.

Defendants also omitted another material fact related to WarnerMedia's costly efforts to divert revenue streams to acquiring streaming subscribers: WarnerMedia's direct-to-streaming movie strategy.

### A. The Offering Documents' Omission of WarnerMedia's Direct-to-Streaming Strategy Was Materially Misleading.

The Offering Documents stated that WarnerMedia's revenues from content consisted primarily of licensing feature films for initial theatrical exhibition and television programs for initial television broadcast but did not disclose that WarnerMedia had already shifted away from these activities and toward a direct-to-streaming approach. JA75–76 (Compl.

¶¶ 171–72). That omission made the Offering Documents materially misleading.

The Direct-to-Streaming Statements misled investors into thinking that WarnerMedia had reverted to releasing films first in theaters. JA75–76 (Compl. ¶¶ 171–74). Instead, WarnerMedia continued to release films to theaters and HBO/HBO Max simultaneously. JA75–76 (Compl. ¶¶ 171–74).

That continued direct-to-streaming approach was material. Direct-to-streaming was a novel—and costly—approach to film releases. JA73 (Compl. ¶¶ 160–62). Investors thought this Covid-era practice would be abandoned once movie theaters reopened, but that was not the case at WarnerMedia. JA74–75 (Compl. ¶ 166). This strategy was risky because films are more profitable when viewed in theaters versus on a streaming service. JA73 (Compl. ¶ 163). As Zaslav explained: "This idea of expensive films going direct-to-streaming, we cannot find an economic case for it. We cannot find an economic value for it." JA75 (Compl. ¶ 168).

WarnerMedia's continued embrace of direct-to-streaming contributed to diminished revenue projections. JA94 (Compl. ¶ 232). Zaslav and Wiedenfels attributed part of WBD's $2 billion revision

downward in EBITDA to WarnerMedia's "substantial investments in direct to HBO Max films." JA94 (Compl. ¶ 232). That WarnerMedia's direct-to-streaming strategy failed to recoup costs both showed the limits of its ability to compete in the streaming market, and also reduced the cash flow that WBD had available to acquire subscribers. That set back WBD's plans—contrary to its statements in the Offering Documents. The market responded by knocking WBD's stock down by 16.5 percent. JA95 (Compl. ¶ 235).

### B. The District Court Erroneously Drew an Unreasonable Inference Against Plaintiffs.

The district court dismissed Plaintiffs' claim that the Offering Documents were misleading when they claimed that WarnerMedia's revenues "consist[ed] primarily" of licensing feature films for initial theatrical exhibition when, in reality, WarnerMedia had already "shifted away" from licensing theatrical films for theatrical distribution in favor of a direct-to-streaming approach, including by continuing to release feature films direct-to-streaming beyond when they said they would. JA75–76 (Compl. ¶¶ 171–74). In doing so, the court drew a decisive inference against Plaintiffs.

The court summarily concluded that the Complaint did not "adequately allege[]" that WarnerMedia had actually made a direct-to-streaming shift because the Complaint relied on a post-merger statement by WBD that it was "making a strategic shift" back to "theatrical exhibition," which did not directly prove that WBD had previously not prioritized theatrical exhibition. SPA22.

Far from making reasonable inferences in Plaintiffs' favor, as required, the district court's approach actually drew an unreasonable inference against them. It is a more-than-reasonable inference that WBD's declaration of its "shift" back to theatrical exhibition meant WarnerMedia previously did *not* prioritize theatrical exhibition. That is precisely what a "shift" means—i.e., that there has been a change.

Indeed, the Complaint alleges that WarnerMedia suffered material financial hardship because of its direct-to-streaming initiative. JA75 (Compl. ¶ 169). Those financial losses would not have been incurred unless WarnerMedia had, in fact, prioritized direct-to-streaming. It was reasonable to infer that WBD CEO Zaslav's statement that he could not "find an economic case" for the practice of "expensive films going direct-to-streaming" referred to the fact that WarnerMedia previously focused

64

on releasing movies direct-to-streaming. JA75 (Compl. ¶ 168). The court failed to draw those inferences as required.

This Court should reverse the district court's dismissal of Plaintiffs' Direct-to-Streaming Statements claim.

## V. THE OMITTED FACTS WERE KNOWABLE AND AVAILABLE TO DEFENDANTS.

Under Section 11 and Section 12(a)(2), the Complaint need only allege that the relevant omitted information was "knowable" and "available" to Defendants. *See HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 299–300 (S.D.N.Y. 2021) (plaintiff must plead that omitted facts "were known or knowable"); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) (referencing information that is "available"). The district court did not address this element of Plaintiffs' claims on appeal here but, in any case, Plaintiffs easily satisfy it.

The omitted information in this case—the number of non-paying HBO Max subscribers, the cut-off of third-party licensing deals, and the continued direct-to-streaming film releases—was knowable and available to Defendants. The virtual data room, which Defendants accessed beginning April 9, 2021, included "company financials, profit

and loss statements and projections, … business plans, product information, … market research and competitive analysis, … sales strategies, [and] new product pipelines." JA42 (Compl. ¶ 57). In the district court proceedings below, Defendants themselves admitted that Discovery's due diligence for the WarnerMedia assets was "thorough," and in line with "the types of diligence commonly done before a company in the [media] industry is acquired." Def.Dist.Ct.Br.25–26. The omitted information was thus knowable and available to the Defendants.

## VI. PLAINTIFFS ADEQUATELY ALLEGED CONTROL PERSON LIABILITY PURSUANT TO SECTION 15.

The district court's dismissal of Plaintiffs' claim for control person liability under Section 15 of the Securities Act relied entirely on its ruling concerning Section 11 and Section 12(a)(2), SPA28. The court's dismissal of the Section 15 claim should thus be vacated for the reasons stated above.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal of the Complaint and remand to the district court for further proceedings.

May 13, 2024                    /s/ Jonathan Berry

Daniel L. Berger                Jonathan Berry
GRANT & EISENHOFER PA               *Counsel of Record*
485 Lexington Avenue, 29th Floor R. Trent McCotter
New York, NY 10017              BOYDEN GRAY PLLC
                                801 17th Street NW, Suite 350
                                Washington, DC 20006
                                202-955-0620
                                jberry@boydengray.com

                                *Counsel for Ohio Public Employees*
                                *Retirement System and State*
                                *Teachers Retirement System of*
                                *Ohio*

                                DAVE YOST
                                OHIO ATTORNEY GENERAL
                                30 East Broad Street
                                Columbus, OH 43215

                                *Additional Counsel for Ohio Public*
                                *Employees Retirement System and*
                                *State Teachers Retirement System*
                                *of Ohio*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the AMCS system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


May 13, 2024                      /s/ Jonathan Berry
                                  Jonathan Berry
                                  *Counsel for Ohio Public Employees*
                                  *Retirement System and State*
                                  *Teachers Retirement System of Ohio*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with Second Circuit Local Rule 32.1(a)(4), because it has 11,728 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

May 13, 2024

<u>/s/ Jonathan Berry</u>
Jonathan Berry
*Counsel for Ohio Public Employees*
*Retirement System and State*
*Teachers Retirement System of Ohio*